IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Joseph Z. Tsien, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ Act No. |
| v. | ) | Complaint |
| | ) | Damages and Injunctive Relief |
| The Board of Regents of the University | ) | Jury Trial Requested |
| System of Georgia, | ) | |
| d/b/a Augusta University, Medical | ) | |
| College of Georgia | ) | |
| | ) | |
| David D. Hess, Dean Medical | ) | |
| College of Georgia individually and under | ) | |
| color of law, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

Complaint

NOW COMES the Plaintiff who states the following against the Defendants:

**Jurisdiction and Venue**

    1.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §
1331 over Counts ____ , which are federal claims under the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. §§ 1981 and § 1981a, and
§ 1983, for race, color and nationality discrimination, retaliation in the
enforcement of an employment contracts under the United States Constitution's

First, Thirteenth and Fourteenth Amendments, for deprivations of life, liberty and property interests in violation of due process and equal protection.

2.      Plaintiff seeks fees and costs under 42 U.S.C. § 1988.

3.      The Defendant employer Board of Regents resides or is found within Fulton County.

**Exhaustion of Title VII Administrative Requirements**

4.      Plaintiff Tsien filed an EEOC Charge by FAX to the Atlanta District Office on or about November 25, 2019, covering conduct for the preceding 180 days, and before, for any preceding discriminatory or retaliatory adverse action.

5.      The EEOC assigned the Charge No. 410-2020-01600, and placed a Notice of Right to Sue in the U.S. mail on February 19, 2020.

6.      Ninety days from February 19th is May 19, 2020, and three days are added for mailing.

**Parties**

7.      Plaintiff Joe Tsien, a naturalized American citizen, whose race and/or nationality could be perceived to be Chinese.

8.      At all material times Tsien was an employee protected and covered by Title VII.

9.      At all material times Tsien was an employee of the Defendant Board of Regents as a tenured, contracted faculty member in the Neurology Department

of the Medical College of Georgia, Augusta University ("AU") of which

Defendant Hess was the Dean

10.     As a tenured faculty member there was a mutual expectation of

continued employment, with the burden upon the employer to show just cause for

termination, or any other material diminution of the employer's obligations to

employee Tsien.

11.     Defendant Board of Regents ("BOR") of the University System of

Georgia ("USG") d.b.a. Augusta University is sued through Sachin Shailendra, in

his official capacity as the Chair, of the Defendant Board of Regents, which is

vested with the governance, control, and management of the Defendant USG, and

all its member institutions, including Augusta University, pursuant to O.C.G.A §

20-3-51.

12.     The BOR is headquartered in Fulton County, Georgia, at 270

Washington St., SW, Atlanta, GA 30334 and may be sued through

13.     Defendant BOR d.b.a. Augusta University is an employer subject to

suit under Title VII, because it has 15 or more employees, and is engaged in

interstate commerce, and acts as a single, integrated employer or enterprise, and/or

joint employer, with Medical College of Georgia, Augusta University, in Augusta,

the location at which Plaintiff was employed.

14.    Defendant David C Hess, MD, is the Dean of the Medical College of Georgia and Professor of Neurology, Medical College of Georgia, Augusta University, who upon information and belief, is a resident of Richmond County, Georgia, is sued individually for action taken under color of law.

**Worldwide Reputation and Subject for Recruitment by MCG**

15.    Plaintiff has a PhD and was a researcher and faculty member at Princeton University.

16.    He began doing experiments and research on genetic decoding, and the question of genetically modified intelligence in various lab animals.

17.    He published the results of studies and experiments asserting that lab rats could be genetically modified.

18.    Before a principle can become accepted other research scientists have to be able to verify the study, in peer reviewed studies, which in the instance of genetically modified rats, requires that modified rats be shipped to other scientists who do their own experiments with animals provided by the other scientists, in this case Tsien.

19.    The peer-review is expensive, requiring time-consuming arrangements for the care, shipment and receipt of the lab animals, which has to be done within national and international laws and regulations.

20.    When other scientists world-wide verify the claims made in research papers, then the researcher develops a world-wide reputation, for the related techniques, in this case to modify genetics to influence intelligence.

21.    One's professional reputation also hinges on a reputation of willingness to cooperate and work with others to allow this peer review process to proceed in a timely and efficient fashion.

22.    Successful verification of research on improving intelligence in lab animals raises question of whether there is application of the outcome of increased intelligence to be applied to humans, which then drives further demand for research by the scientist.

23.    As others verified the results of Mr. Tsien's techniques and experiments, and his professional reputation grew, increasing his value in the scientific community, is worth and ability to get to fund for research.

**Recruited by Boston University**

While Tsien was still at Princeton, he was recruited by **Boston** University to become the Director for the Systems Neuroscience Center.

At Boston University he was given a full tenured professorship as a tenured professor, which means that the university tenured professor can only terminate the professor for egregious acts.

**Recruited by MCG in 2007**

24.    Based on his reputation and knowledge, in 2007, then MCG President Dan Rahn, the MCG Dean and MCG Neuroscience clinician Dr. Darrell Brann and laboratory scientist Robert Yu, PhD Director of the department now known as the Department of Neuroscience, recruited Plaintiff from Boston University with the promise of a position as a tenured, full professor in the Department of Neurology, an endowed Chair, with the title Georgia Research Alliance (GRA) Eminent Scholar in Cognitive and Systems Neurobiology, and Plaintiff was to serve as the co-founding Director of Brain and Behavior Discovery Institute (BBDI).

25.    A condition of the offer was that MCG would the construct a lab specifically designed for the experiments that Tsien conducts.

26.    The estimated cost of the lab was $3,000,000 dollars.

27.    The quality of the lab made the BBDI a world leader in genetic modification for intelligence and it was critical to Tsien's work.

28.    With Plaintiff's reputation and connections, Plaintiff was a moving force in obtaining $10 million dollar commitment from GRA, enabling  a successful launch enabling operation of the Brain Decoding Project.

29.    The BBDI then established the first worldwide Brain Decoding Project.

30.     Over the next decade, the breakthroughs of the Brain Decoding Project were recognized by many publications and in peer-reviewed journals and major news media including the New York Times, Wall Street Journal, Business Insider, World Economic Forum, and Forbes Magazine.

31.     Over the past 12 years, the Brain Decoding Project has published over 60 research papers in peer-reviewed scientific journals.

32.      Over the past 12 years, the Brain Decoding Project has brought in $16 million dollars to MCG/AU, including one patent.

33.     From 2007 to 2017, David Hess, current Dean of Medical College of Georgia, and former Department Chair of Neurology and Plaintiff served as Co-Directors of BBDI.

34.     Plaintiff Tsien was responsible for the basic neuroscience program, and Dr. Hess was responsible for clinical neuroscience.

35.     In 2017, Dr. Hess was appointed Dean of MCG by President Keel, after the former Dean, Peter Buckley left MCG.

**2018, and the change of climate with federal investigation of Chinese and Chinese American scientists and researchers.**

36.     Nationally, from a sources known and unknown nknownsources, some legitimate, some not, and with and without good reason, a toxic climate

developed against Chinese and Chinese American scientists and researchers, mainly at universities.

37.    Scientists and professors were wrongfully accused various forms of illegality as US-China trade war tension increased.

38.    In January 2018, the executive ordered the National Institutes of Health to implement the so-called Conflict of Interest investigations, selectively targeting Chinese-born American scientists at many research universities and institutes nationwide.

39.    FBI and Homeland Security have targeted investigations of Chinese immigrants and Chinese Americans, especially those known to have been Chinese Talent Program scholars, which is similar to an endowed professor chair positions at a US institution of higher learning.

40.    Professors selected could serve as either in a nine-month research and teaching position or a two-month period as a visiting scholar at various Chinese universities.

41.    Several high-profile cases showed that these Chinese American professors and scientists have been wrongfully accused and were subjected to racial profiling and discrimination.

42.    Prior to this time of investigation of Chinese scholars many institutions, including MCG, beginning with President Rahn and at least through President Aiziz and Rahn fostered and used resources to promote collaboration with researchers and professors in Chinese universities, and many MCG professors did so over the years.

**1.  On March 1, 2018, Dr. Hess informs Tsien that Homeland Security and Customs and Border Protection were  inquiring about Tsien's trips to China, and Dr. Hess tells Tsien to "Go back to China!"**

43.    At a meeting on March 1, 2018, Dr. Hess told Plaintiff Tsien that he "should go back to China and take a job there!"

44.    Tsien was called to a meeting with Dr. Hess who told Tsien that Homeland Security and Customs and Boarder Protection were inquiring why Tsien traveled to China so frequently.

45.     After Tsien explained that the visits were part of his international collaboration efforts necessary for carrying out and continuing the Brain Decoding Project initiated with the support and requests of former President Rahn and Deans, Dr. Douglas Miller and Dr. Peter Buckley. Each of Tsien's trips had been preapproved by the University.  Moreover, this international collaboration has benefited MCG at multiple levels, from attracting talent to MCG, to publishing high-profile research papers and to obtaining research grants, etc.

46.    Plaintiff was shocked, hurt and surprised when Dr. David Hess told Tsien he "should go back to China and take a job there!"

47.    Shortly thereafter Tsien was removed from the position of co-Director BBDI by Dr. Hess.

48.    Dr. Hess then dissolved the institute entirely and terminated Tsien's administrative assistant, Sandra Jackson.

49.    Tsien was re-assigned to the Department of Neuroscience & Regenerative Medicine (DNRM).

50.    This demotion from a Director to a researcher occurred without any hearing professor.

51.    At the time, Tsien told Sandra Jackson about the meeting, and Tsien thought that Hess's comment that he "Go back to China" was shocking because Dr. Hess and other white faculty often traveled to China for collaboration or academic matters.

52.    It was shocking because, Dr. Hess and Tsien had been co-directors of BBDI for the past ten years.

53.    Because Dr. Hess is now the Dean, his racially discriminatory comment and action to close BBDI made Tsien feel unwelcome, and that all of his all past efforts and contribution to MCG/AU were unappreciated.

54.    Tsien was misled led to believe, at the time, that Dr. Hess is

dissolution of BBDI was purely due to normal restructuring, resulting from MCG's

poor financial status.

**2. David Hess and the Department interim Chair Darrell Brann began to**
**interfere with Tsien's travel requests, with long delays for approval,**
**interrupting Tsien's attempts to continue international scientific**
**collaborations, give seminars and attend conferences taking place in May,**
**July and September, 2018.**

55.    May 2018:  Trip to China for continuing the Brain Decoding

Project research collaborations.

56.    July 2018: Trip to China and Singapore to give seminars and to

continue and extend collaborations.

57.    September 2018: Trip to Europe to give seminars in University

College London, University of Helsinki, Finland and University of Copenhagen,

Demark.

**3.  On February 7, 2019, Dr. Hess issued Tsien a letter to cease discussing with**
**fellow faculty members on the Chair-Search Committee (copied to Susan**
**Norton, Senior VP for Human Resources at AU, and Chris Melcher, Senior**
**VP and General Legal Consul at AU) after Tsien, as a committee member,**
**voiced concerns about the internal candidate Dr. Darrell Brann (interim**
**Chair) hand-picked by the Dean Dr. David Hess to become the Chair of the**
**Department.**

58.    Beginning in the Spring of 2018, Tsien served as an original member of Department of Neuroscience and Regenerative Medicine (DNRM-Chairman Search Committee.

59.    On Tuesday, January 29, 2019, Dr. Tsien interviewed Dr. Darrell Brann, white American male, who was an internal candidate who was hand-picked by Dr. David Hess to become the Department Chair.

60.    On February 6th, the Search Committee met to evaluate Dr. Brann's qualifications and potential as the possible Chair.

61.    Several, along with Tsien expressed a set of concerns about Dr. Brann at the meeting.

**Tsien further followed up the meeting with email discussions the afternoon of February 6 (Wednesday) about several important problems of administration at the level of MCG and Department which had been begun to depress faculty morale and negatively impact faculty retention and future recruitment**.

62.    In Tsien's email, dated February 6, 2019 at 4:40 pm, Dr. Hess and Dr. Alvin Terry, the Chair of the Search Committee and copied it to all of the members.

63.    Tsien used two points to illustrate his concerns, that a new Chair should be brave enough to speak out for faculty.

64.    First, the recent denial of travel requests to China, to give seminars and conduct scientific collaborations, which was adversely impacting international collaboration and weakened connections that created relationships that favored the State's medical college.

65.    MCG has a large number of Chinese American professors with strong cultural and scientific ties, with personnel at Chinese universities, which was a unique asset that provided many benefits to MCG and AU.

66.    Second, a newly installed AU policy insisted that faculty who served on the National Institute of Health (NIH) Study Sections as grant reviewers would be required to use their own vacation time, rather than the off-campus professional activity.

67.    The question was whether Darrell Brann would support these positions that were in the interest of faculty and helped the prestige of the public's medical college on not only a short-term basis, but the long-term basis of trying to become a prominent, public university.

68.    Immediately after this email, on February 7, 2019 (5:13 pm), Dr. Hess sent Tsien an email (copied to Susan Norton, Senior VP for Human Resources at AU, and Chris Melcher, Senior VP and General Legal Consul at AU) ordering Tsien to cease sending any more emails to the committee about these matters of

personal and public concern, and to schedule a meeting with Dr. Hess to review the matter.

69.    Dr. Hess also sent an email (February. 7, 5:18 pm) to all committee members, characterizing Tsien's prior email, as Dr. Tsien's personal issue, and that it contained "misinformation" about the requirement to take annual leave (vacation) to serve on NIH Study Section.

70.    Tsien wrote his rebuttal the next day on February 8, 2019 (10:00 am, 10:10 am, 4:11 pm) by listing a set of emails from the Dean's office (Jacqueline Mims, for example, dated  October 19, 2018) letting the faculty know the new policy for requiring primary investigators on grants to use their own vacation time for NIH service.

71.    Tsien received and email from Darrell Brann for a meeting with Dr. Hess at his office on February 15.

72.    Tsien thought that he would be given an opportunity to explain the importance of his for February 17th travel to China, where he was invited to give seminars, and Co-Chair a conference so they would approve his travel.

73.    All of his prior travel requests to China over the past ten years had been granted.

**Chronology of the Discriminatory and Retaliatory Actions taken by David Hess and other Top administrators:**

74.    1) The retaliatory, discriminatory and pretextual investigations about employment positions in China was announced Friday afternoon, February 15, 2019, purposely ruining Tsien's upcoming travel starting on Sunday February 17, to give seminars and host a research conference in China.

75.    Dr. David Hess and Susan Norton barred Tsien from any travel and subjected him to a campus version of house arrest, for the entire duration of the investigation, which continued until he was constructively terminated in the fall of 2019.

76.    Dr. Hess, Susan Norton and Dr. Darrell Brann together launched the investigation against Tsien on February 15, 2019 (at the 1 pm meeting) about two employment positions in Shaanxi province of China that Tsien allegedly had, which he did not.

77.    This was a retaliatory action following Dr. Hess' email to Tsien on February 7th which he copied to Susan Norton and Chris Melcher, against Tsien voiced opposition, shared by many other faculty members, about Tsien's opposition to Dr. Hess'choice of Darrel Brann, for the Department Chair, as well as the short-sighted policy change regarding the use of annual leave vacation instead of the off-campus activity service.

78.    For instance, travel to NIH and work on grant selection, using off-campus activity service created relationships with NIH personnel and others who participate in grant review, and helped the institution get grants.

79.    The allegation that Plaintiff had employment positions in China was based on a misinterpretation of some articles originally from the internet in Chinese.

80.    The articles mentioned Tsien's attendance at an event that occurred in July 2018, in Shaanxi, China about expressing interest for future joint collaboration on the Brain Decoding Project Research, which Tsien had been directing since his arrival at MCG in 2007, with strong support from former President Daniel W. Rahn and Dean Dr. Douglas Miller.

81.    The official investigation letter, issued by Susan Norton, VP for Human Resources, was read by Dr. Hess and handed to Tsien in the presence of Debra Arnold, of HR, and Darrell Brann.

82.    Under the name of this investigation, AU illegally placed Tsien under the campus-version of house arrest.

83.    The house arrest deprived Tsien of his basic civil rights, such as the freedom to travel.

84.    The house arrest deprived Tsien of the ability to protect and enhance his professional reputation by giving seminars, to learn and attend professional conferences, to make contacts that would influence and benefit the institution, and to have sick days and take annual leaves, etc.

85.    To ensure this campus-version of house arrest would be executed daily, Susan Norton and David Hess ordered Ann Stephens, the Department business manager, "to physically check in with [Tsien ]during the morning and afternoon each work day to confirm that [he was] … working on campus."

86.    When Tsien protested this wrongful treatment to a tenured professor, Dr. Hess told Tsien that he would remain under house arrest, and that Tsien was "guilty until you prove your innocence."

**Tsien rebutted his absurd instruction by saying that laws in America ensure every citizen remains innocent until proven guilty.**

**Tsien had basic rights as an American citizen, such as to travel for learning and doing his job, of collaborating with other scientists, giving seminars and even looking for other employment.**

**Tsien had contractual and other federally guaranteed right to work benefits such as sick leaves if his covered family members were sick, and the ability to use earned vacations with his family.**

**Dr. Hess insisted that all of Tsien's requests for leave or travel would be denied, including sick leave, until after completion of the investigation.**

**Hess further threatened Tsien, pointing to the letter's last sentence: "Refusal to follow directions will be viewed as insubordination, subjecting [Tsien] to discipline up to and including termination."**

87.    It is noted that the timing and date of the meeting (February. 15, Friday 1 pm) was set to disrupt Tsien's scientific collaboration and travel agenda, where administration would know his schedule from the planning.

88.    Hess and others knew that Tsien was about to leave February 17th, 2019 (Sunday morning), for travel to China for seminars and conferences at several Chinese universities, and they announced the investigation on February 15, Friday afternoon, despite the fact that Tsien's travel request was made in early January.

89.    As a result of this suddenly announced investigation, Tsien was forced to abruptly cancel his flights and hotels, and apologize to the seminar hosts, other speakers and student audience for not appearing at the seminar, injuring Tsien's professional.

90.    Tsien was forced to attend the first interrogation on February 19, 2019, with flu and higher fever, out of the fear that he would be fired if he were to take a sick leave.

91.    The first investigation meeting was scheduled on February 19 (Tuesday) with Debra Arnold, the Director of Employee Relation at HR and Crystal Corey of Internal Audit.

92.    During the interview, Tsien answered all questions and provided the background for the on-going Brain Decoding Project work, which required extensive travel and international collaboration.

93.    Although Tsien would have liked to have taken sick leave for the next several days and based on advice of Tsien's physician, Tsien was afraid to postpone the meeting out of fear of being fired because Dr. Hess and Susan Norton had told him explicitly that "you are thereby required to be at work on campus each day."

94.    Tsien's doctor ordered a prescription that day.

95.    Over the next few days Tsien had to sleep on the office floor during lunch break to battle high fever.

96.    Tsien wrote about this inhumane and unfair treatment to several of his close colleagues, including Tsien's former administrative assistants Sandra Jackson and Toni Goodly, former President of AU Ricardo Azziz and Toni Baker, Communication Director of MCG.

**On March 1, 2019, Dr. David Hess removed Tsien from the DNRM Chair-Search Committee, along with many faculty members who also voiced their concerns about hiring Brann, using the pretext of the search committee reorganization.**

97.    After Dr. Brann's failed candidacy, Dr. Hess "reorganized" the Search Committee on March 1, 2019, and removed Tsien and several other senior faculty members from the Search Committee, who also voiced various concerns about Dr. Darrell Brann and Dr. Ben Giasson, an external candidate from the Univ. of Florida.

98.    Dr. Ben Giasson, who was also strongly favored by Dr. David Hess during the previous round of interviews, said that he is now "really" interested in considering the Chair position after his earlier rejection of the offer from Dr. Hess several months before.

99.    It should be noted that the first offer letter to Dr. Giasson from the Dean Dr. Hess was also made against many concerns raised by Tsien and several other former search committee members.

100.    For unknown reason, Dr. Giasson suddenly wanted to revisit on March 21, 2019 and renegotiate.

101.    Despite receiving less-than-lukewarm reactions from Tsien's department faculty members, Dr. Hess offered Dr. Giasson a second offer letter with an enhanced package.

102.    Dr. Giasson never came back.

103.   4. On March 8, 2019, Drs. Hess and Brann denied Tsien's request for an emergency visit to attend to Tsien's 79-year old mother in China who had fallen and fractured bones.

104.   Under the name of the alleged investigation, Drs. Hess and Brann also barred Tsien sick and annual leave, to which he was entitled.

105.   On about March 8, 2019, they denied Tsien requests for a medical emergency visit to take care of his 79-year-old mother who in Yunnan,   China who suffered from two rib fractures from an accidental fall on March 8, 2019.

106.   5)  Debra Arnold repeatedly refused Tsien's requests to have access to the original articles in Chinese she used  to claim that Plaintiff had Chines employment, or to let Tsien know the sources of the allegations.

107.   As a result, Tsien could not check the accuracy and the translation errors that Debra Arnold or others made using Google Translate to interpret Chinese, where they claimed they had evidence Tsien was an employee or part owner of a Chinese company.

108.   6) Dr. Hess denied Tsien multiple requests for Tsien to take Spring break with his family, using earned annual leave/vacation time to which he was entitled and had accumulated over 38 days.

109.   On March 14, 2019 Tsien requested to take vacation for Spring break during the Masters week, so that he could rent out his house during the Master's Golf tournament week.

110.   White employees and others were allowed to take vacation during the Masters week and were allowed to rent out their houses

111.   Dr. Hess denied Tsien's request for vacation during spring break.

112.   Tsien wrote to Hess again on March 18, asking him to reconsider, explaining that Tsien and his wife were taking their six-year-old daughter to Disney in Orlando, a promise made at Christmas.

113.   Despite pleas to Hess to avoid disappointing his family Dr. Hess again denied the request, saying he would set up a meeting with Tsien the next week, probably on Wednesday he said, which never took place.  (emails March 19 and 25).

114.   Dr. Hess' denial of Tsien's spring break went against President Keel's open letter to all faculty and students issued on April 2, encouraging everyone to take a much-deserved Spring Break with friends and families.

115.   Tsien's wife and he were forced to withdraw the rental of their house to Masters renters, which would have paid about $18K-35K for their 6 bedrooms/6.5 bath house.

116.    Tsien had to cancel reservations in Orlando (emails March 15 and April 2, 2019).

117.    Tsien's six-year-old daughter and wife had to stay at home while Tsien had to be in his office each workday during the Masters week because of the campus arrest imposed by Defendant Hess.

118.    While confining Tsien to campus arrest, where he had to be in his office or lab all day, Dr. Hess, Dr. Brann and Susan Norton all left the town on their own vacations.

119.    7) Dr. Hess denies Tsien's request for an emergency medical visit to see his wife's 96-year-old grandmother, as to whom an ER warning had been issued to the family.

120.    April 11, Tsien requested one week sick or annual leave time, from April 22-May 1, to visit his wife's 96-year-old grandmother, who went into a coma, and was issued an ER notification on the evening of  April 7, by the Shanghai hospice hospital.

121.    On April 12, Dr, Hess again rejected Tsien's emergency medical visit request. (email on April 12).

122.    Dr. Hess told Tsien that he and the investigation team needed to meet with Tsien on April 22 or 23rd.

123.   Again, no meeting was ever scheduled or took place during the period.

124.   Tsien communicated his distress about Dean Hess preventing travel and the emotional trauma of this experience with Dr. Robert Malenka -- a colleague of Tsien's, and distinguished professor in Psychiatry at Stanford University. (emails to Hess on April 16 and 17th).

125.   8)  On April 1, 2019, Tsien accidently realized that Dr. Hess had secretly taken away his start-up fund which Tsien had saved over the past 12 years due to success in obtaining external grants.

126.   Tsien only learned about this in March when Tsien's post-doctoral associate and Tsien were gearing up for extensive experiments so that they could compete more effectively for external NIH grants for the June 5th and July 5th deadlines.

127.   Dr. Hess took Tsien's start-up fund without any prior warning or any post-taking notification.

128.   Tsien tried to find out when Dr, Hess took the start-up fund from Ann Stephens, but she refused to give him a definitive answer. (see Tsien email to Ann on April 1 and 2).

129.   Tsien then wrote to Dr. Hess, protesting his taking of the money without notice and described the importance of this fund to Tsien's research at this critical time. (email April 18).

130.   Dr. Hess wrote back on April 18, claiming there was a time limit to retain or use the fund as an excuse for taking Tsien's startup funds.

131.   Tsien a had not been given notice of such a limit nor that the funds would be taken.

132.   Tsien inquired about the time limit policy on the start-up fund with Dr. Neal Weintraub, a GRA scholar recruited to MCG four years before as the Director of Cardiovascular Center.

133.   Dr. Weintraub told Tsien that he specifically asked about this during his recruitment due to his previous bad experience at the University of Cincinnati, but he didn't remember any official answer on the issue. Weintraub left Cincinnati after the Dean took his start-up money without any warning or prior notification. (email on April 19).

134.   In the follow-up email to Dr. Hess, Tsien pointed out that he had finally come to realization that Hess' discriminatory and retaliatory actions may have dated back as early as March 1, 2018, when Hess told Tsien to "Go Back to China."

135.   Tsien also pointed out to Hess that all of his adverse treatment made AU a hostile place for Tsien to work, in the hopes that it would get Hess to stop.

136.   Tsien further requested (email to Hess on April 18) that given how badly Hess wanted Tsien to leave AU and this country, Tsien would asked permission to let him give seminars and attend conferences so he could  rebuild academic and social reputation, and to give talks at other institutions that might help him land a job.

137.   But unfortunately, Hess completely ignored Tsien's request, saying that he, Debra Arnold and Dr. Darrell Brann will have another investigation meeting with Tsien on April 24, 2019.

138.   9)  On April 24, 2019.  Tsien was called to a meeting with Dr. Hess, Debra Arnold and Darrell Brann and Dr. Hess then issued a letter to Tsien stating that Tsien's GRA Eminent Scholar endowed chair position would be taken away July 1, 2019.

139.   10)  As a result of stripping Tsien of the GRA Eminent Scholar's title, Tsien lost access to the GRA Eminent Scholar's annual support fund associated with the GRA Eminent Scholar position.

140.   When Tsien questioned Hess' authority for this taking, Hess said that "Dr. Keel and GRA had already approved it."

141.    Intriguingly, when Tsien called Susan Shows, Vice President at GRA who oversees the GRA Scholars Program, she was surprised by the news.

142.    The surprise of Susan Shows lead Tsien to question the truthfulness of Dr. Hess.

143.    When Tsien wrote to President Keel later in May, Tsien received no confirmation or denial on this specific issue.

144.    11)  On April 24, the second interrogation meeting was scheduled during which Debra Arnold and Crystal Corey issued Tsien another letter, listing a set of seven new questions, reflecting the intentionally harassing nature of this ever-evolving, witch-hunt investigation.

145.    When Tsien protested this his series of discriminatory and retaliatory actions, Dr. Hess screamed "Get out of here!" at Tsien multiple times. Dr. Brann and Debra Arnold were in the conference room.

146.    This occurred with several office staff in the hallway, which further humiliated and traumatized Tsien publicly.

147.    In the letter, they listed their so-called new discovery and obtained the additional information indicating other commitments in China (other than the original allegation for potential employment in Shaanxi Province which Tsien did not have).

148.   When Tsien realized the obvious translational errors and three different names listed on the letter, Tsien asked for the original Chinese internet articles and sent Arnold authoritative articles about the problems of using Google Translate.

149.   Debra Arnold simply refused Tsien's request and insisted on Tsien's compliance with their deadline of May 8, 2019.

150.    Tsien pointed out the problems in relying on internet articles which were often written without fact-checking with anybody as the basis for this discriminatory interrogation of Tsien.

151.   Nonetheless, Tsien timely provided the answers, which showed Tsien's innocence and had no conflict-of-interest engagement in China.

152.   At the meeting, Tsien protested various actions taken by Dr. Hess -- such as taking away Tsien's start-up funds and GRA scholar endowed chair and the denial of Tsien's various requests for vacation, sick leave or emergency medical visits -- were solely to emotionally traumatize Tsien and his family and to systematically harm and destroy Tsien's research and reputation.

153.   When Tsien questioned the timing of all Hess' actions, as Hess knew very well that Tsien was busy with the process of preparing federal grant submissions for the June and July deadlines.

154.   Dr. Hess screamed at Tsien multiple times in front of Dr. Brann and Debra Arnold and his office staff: "Get out of here!"

155.   Dr. Brann looked on with a sick, disdainful smile which caused Tsien serious emotional suffering.

156.   12) On April 26, 2019, Tsien filed a complaint with Debra Arnold and explicitly described what happened, from the February 15th investigation meeting, and the set of discriminatory and retaliatory actions taken since then by Dr. Hess against Tsien (emails to Arnold on April 26, 11:40 am).

157.   Tsien reported to Deborah Arnold the statement by Dr. Hess that Tsien should "Go Back to China" and five retaliatory retribution against Tsien because he voiced concerns about Dr. Brann's previous candidacy hand-picked by Dr. Hess.

158.   Tsien further requested her attention and raised the question why HR selectively targeted Tsien for the conflict of interest investigation, while Drs. Hess and Brann –who also had multiple trips to China, or held some visiting professorships or collaborations there over the past years, were not investigated.

159.   Shortly after Tsien's complaint email to Debra Arnold, Dr. Hess hastily nominated Dr. Xin-Yun Lu as the internal Department Chair ccandidate. Tsien heard the news on May 7th, 2019.

160.   Dr. Lu was interviewed on March 21 and officially started as the Chair on July 1, 2019.

161.   All this happened so hastily, the re-organized Search Committee did not get a chance to launch any public search or to interview any other candidates.

162.   This suggests that Dr. Hess made this move as part of his cover-up efforts to hide that race or nationality was a factor in his proposed choice of Dr. Brann and then in abandoning the search committee.

163.   Interestingly, when Tsien asked Dr. Lu about the date on which Dr. Hess met with her to discuss this matter, she refused to answer and replied "I don't remember." (see Dr. Lu's email on May 8, 2019).

164.   13) On May 7, 2019, Dr. Michael Diamond, Senior VP for Research and Dr. Hess issued Tsien a lab space reassignment order to take away Tsien's uniquely designed laboratory in the CL building, as well as Tsien's spacious office suite that connects to Tsien's laboratory.

165.   Dr. Michael Diamond, Senior VP for Research and Dr. Hess sent Tsien a letter, via a strange channel (Nick Shaurette of Lab Animal Service), informing Tsien that the laboratory built for Tsien (3600 sq. ft) in the Hamilton Building (CL 3rd floor), which architects specially designed for Tsien's unique

large-scale, chronic in vivo recording experiments, would be taken away by May 31, 2019.

166.   As a result, Tsien lost 95% of his equipment and basic ability to conduct brain decoding research, which was Tsien's tenured position, and future research program.

167.   A condition of Tsien's employment with then MCG was that such a specially designed lab would be provided and that Tsien would have a tenured professorship and Eminent Scholar endowed chair position, so that Tsien would be able to pursue his research until Tsien retired or died.

168.   Such premeditated and systematic sabotage by Dr. Hess and his associates have jeopardized not only Tsien's current grant-supported research, but also all pending and future grant opportunities.

169.   The reassigned lab has only two small rooms (CB2612 room, 427 sq. ft and CB2610B room, 197 sq. ft) which lack appropriate ventilation and light/dark cycle control and humidity regulation, which is essential to chronicle animal in vivo recording experiment and the active Army grant-sponsored research program.

170.   14) On May 22 and 23, 2019, Tsien wrote to President Brooks Keel and Chancellor Steven Wrigley, and all members of The Board of Regents of the

University System of Georgia, outlining a list of the hostile actions taken against Tsien due to various discriminatory and retaliatory actions by Dr. Hess.

171.    Tsien also pleaded to save his research laboratory in the CL building, which was specifically designed and built for Tsien's use as the condition for Tsien coming to MCG in 2007.

172.    President Keel and Chancellor Wrigley never replied to Tsien directly.

173.    Christopher Melcher wrote back via an email on May 23, and suggested that Tsien contact Glenn Powell, the Director of the Office of Employment Equity (EEO) for further assistance.

174.    Tsien filled out the EEO complaint form on May 29, 2019.

175.    After meeting with Powell, and several emails being exchanged, Tsien was told initially by Glenn Powell that he did not see that Tsien's case would fit within the EEO jurisdiction and suggested to file for the Grievance with Debra Arnold's office for Employee Relations.

176.    Powell also promised that he would find the Grievance form for Tsien to fill out.

177.    Tsien raised his strong concern to Powell that Debra Arnold was part of the institutional tool in creating the hostility, which clearly creates the conflict

of interest if Tsien were to count on her to investigate the problems. (see email on June 5, 1:53 pm).

178.    The next day, June 6, Glenn Powell wrote Tsien back and said that he has been informed that the issues which Tsien had would not be covered by the grievance process and insisted that Debra Arnold can review Tsien's concerns objectively. (June 6, 4:10 pm).

179.    All of Tsien's efforts and pleading for help from President Keel and Chancellor Wrigley, including to save Tsien's laboratory, ended up futilely in a bureaucratic circle.

180.    16) On May 24, Tsien pleaded to Dr. Hess (copied to President Keel, Drs. Diamond and Darrell Brann) for re-consideration to let Tsien retain part of the CL laboratory.

181.    Tsien described why these specially designed in vivo recording rooms are essential for Tsien's ongoing and future research.

182.    Tsien proposed a compromise solution that he was willing to give up his spacious office suite, and also most of the CL laboratory space.  However, Tsien asked to keep four recording rooms (which is about 140 sq. ft per room, with the total size about 600 sq. ft, the same as the reassigned CB2612 and 2610B rooms.  (email May 224, 2:44 pm).

183.   No one replied.

184.   On June 4, Nicholas Shaurette and Ann Stephens, who were tasked to move Tsien's lab, were asked in conversation an email about the status of the request and neither could give Tsien any answers as Tsien was waiting to hear back from President Keel and Vice President Michael Diamond.

185.   17) On June 5, Tsien wrote another email to President Keel (and Nicolas Shaurette and Ann Stephens), asking the President to stop the discriminatory and retaliatory wrongful action by Dr. David Hess. (email on June 6, 4:25 pm).

186.   18) On June 7, Tsien's office was notified by Patricia Charlton, the Director of Veterinary Service at the Division of Laboratory Animal Service (LAS) of AU, that the transgenic mice as to which there had been a long-standing plan to ship the mice to Professor Deheng Wang at Shanghai University of Traditional Chinese Medicine (SUTCM), was abruptly stopped by Dr. Michael Diamond's Office (VP for research which oversees LAS operation) (email Friday, June 7, 2019, 9:00 am).

187.   It is standard policy for various federal grant agencies and scientific journals that authors are required to provide any published materials, including reagents and mice to other researchers upon request.

188.   Tsien's paperwork for mouse export had been in the works since April 24, which involved USDA, shipping companies, and persons at both institutions.

189.   The planned shipping date was finally set for the next Monday, June 10. It was a complete surprise and shock that the shipment was halted by VP's office.

190.   The VP's office did absolutely nothing for the past months and then suddenly, on the Friday, June 7, as the mice were about to be shipped out on the next Monday, June 10, called for the review of the policy for the transfer and export of materials, cells or animals and suspended the shipment of our mice to collaborators. (email on June 7, 9:49 am).

191.   This disrupted all the planned logistics as well as the experiments which Professor Wang at SUTCM was planning.

192.   Tsien had to apologize to Professor Wang and the receiving company in Shanghai which handled the mouse importation.

193.   On June 10, Tsien wrote to Dr. Michael Diamond and Dr. Alvin Terry and listed a set of publications in which Tsien reported the generation and analysis of these mice. (email on June 10, 9:24 am).

194.   On June 19, Tsien further inquired about the status of their review on our mice. (email on June 19, 10:03 am).

195.    On July 1, Tsien talked with Alvin Terry, Associate VP for Research, about the hostility and mice issues that Tsien had experienced.

196.    Dr. Terry was generous in offering inquiry and would help if he could. But Tsien was told that the suspension would remain in place until further notice, mentioning that the Dean's office would be contacting Tsien soon regarding a meeting with Dr. Hess. (email on June 27, 5:52 pm).

197.    This clearly suggested that the abrupt suspension of the mouse export was part of Dr. Hess' and his associated administrators' actions.

198.    19) On June 12, Tsien received an email reply from Wesley Horne, Director of Ethics & Compliance at Board of Regents of the University System of Georgia, on behalf of Vice Chancellor John Fuchko in receipt of Tsien's letter to Chancellor Wrigley (see email on June 12, 9:12 am).

199.    Tsien replied back on June 13, 10:13 am, thanked them for their time and attention.

200.    20) On June 18, Tsien wrote again to President Keel and Vice Chancellor Fuchko about the continuing and new hostility from Dr. Hess.

201.    This time, it involved Tsien's travel request to attend the Army science conference to be held from June 17-20 in Houston, which Tsien was obligated to attend as an Army grantee.

202.   Dr. Hess denied the request. (emails June 14, emails June 13, 8:52 am and June 14, 9:18 am, 9:45 am, 9:50 am, 11:30 am and 1:11 pm).

203.   Tsien was forced to cancel his flights and hotel reservation.

204.   Tsien had to apologize to Dr. Frederick Gregory from the Army research Lab who manages the Army grant review process, and who organized the conference.

205.   21) On June 20, people who worked for Tsien and Tsien found themselves locked out of the CL laboratory and office as they came to work that is morning.

206.   Dr. Michael Diamond, Senior VP for Research issued Tsien an email on the evening of June 19 (cc'ed to Hess, Darrell Brann, Ann Stephens and Nicholas Shaurette) (Wednesday, June 19, 6:30 pm).

207.   In the email, Dr. Diamond stated that "AU is initiating the transition of your lab space tonight to CB 2612 and CB2610B, and your office space to CB2605."

208.   Ann Stephens and Nicholas will help facilitate the move.

209.   Tsien was told, "It would be fine for you to work from home during the initiation of the transition, until next Wednesday."

210.   Because Tsien was locked from his office, Tsien went to Ann's office and read the email mentioned above.

211.   Tsien also asked Ann to call Dr. Diamond's office, as well as President Keel's office for an emergency meeting.

212.   Tsien's requests were denied but he was told later that Tsien needed to "first follow the chain of command." (email on June 20, 12:41 pm from Jacqueline Stephens, Sr. Executive Assistant to the President).

213.   From Ann's office, Tsien also emailed Dr. Diamond about this extreme action in locking Tsien's lab personnel and Tsien out of the lab and office, and questioned the reason why locking them out was the way to help facilitate the lab move.

214.   Tsien further protested stating that this lock-out had disrupted and destroyed on-going experiments and endangered live animals inside the laboratory (see emails on June 20, 21, 24, etc.).

215.   Dr. Diamond refused to answer Tsien's questions.

216.   As a result of this sudden action, Tsien lost access to his high-blood pressure medicine for five days. (see email on June 24, Monday, 11:36 am and 5:17 pm).

217.   Tsien was escorted to his office to get his medicine on Monday.

218.    Tsien saw that one desktop computer (Mac) was missing, whereas Tsien's HP desktop computer was laid flat on the desk, apparently someone also searched and worked on it.

219.    Tsien's lab personnel were only allowed to take small lab items and were not to touch computers, hard-drives, and laboratory notebooks, under the watchful eyes of Ann Stephens and Nicholas Shaurette.

220.    Tsien further protested the utter lack of respect and traumatizing treatment which made Tsien and is lab personnel like objects of scorn and hatred, whose lives and work could be arbitrarily and hatefully destroyed under color of law, on account of race and/or nationality..

221.    Nicholas immediately threatened to call the campus police.

222.    Since June 19, 2019, Tsien has had no access to the computers inside the laboratory nor electrophysiology instruments which came with the pre-installed computers that are essential for running the equipment to date.

223.    All of Tsien's emails to Dr. Michael Diamond were referred to Dr. Hess that Tsien would be contacted to have a meeting.

224.    23) On July 2, Tsien wrote to Susan Norton and Debra Arnold and requested the immediate end of the witch-hunt invesgood faith tigation and destruction of Tsien's research and to gain his freedom.

225.  Devastated by the hostilities and loss of his research capacity, Tsien waited hopelessly to hear from Dr. David Hess and Susan Norton for a meeting, which they repeatedly said they would have since April 24.

226.  Tsien again wrote to Debra Arnold about AU's bad faith in failing schedule the meeting even though they kept saying they would. (email on July 2, 2019, 11:13 am).

227.  This protest email was copied to President Keel, Vice Chancellor John Fuchko, Senior VP Michael Diamond,  Dean Dr. Hess and VP for HR Susan Norton.

228.  24) A meeting was finally scheduled on July 17, and Tsien met with Susan Norton, David Hess and Debra Arnold at the Dean's office at 2 pm.

229.  Instead of answering Tsien's questions regarding their discriminatory and retaliatory actions they produce another letter, requesting new information on Chinese patents which showed Tsien's former Chinese name.

230.  Tsien protested and asked them to end this ever-evolving, witch-hunt based on the initial allegation of potential employment positions at Shaanxi Province, and he demanded they stop the destruction of Tsien's research and reputation.

231.  They set a deadline to receive Tsien answers by July 25, 5:00 pm.

232.   Tsien explained that those Chinese patents were filed by Chinese colleagues and friends with whom Tsien interacted, and they included Tsien's name without consulting with him seeking Tsien's written consent.

233.   Tsien further showed that this interaction has been beneficial to AU at multiple levels, and actually led to a joint US patent awarded to MCG t December 2018.

234.   25) On July 30, 2019, Tsien accidently found out that various people from other laboratories and departments had been going to Tsien's laboratory, taking lab items, equipment, supplies without Tsien's consent.

235.   The people were taking items from Tsien laboratory included Dr. Phillip Wang who works in the laboratory of Dr. David Hess.

236.   While Tsien was looking for Ann Stephens the morning of July 30 outside of Tsien's CL office, which remained locked precluding Tsien's entry, Tsien noticed that Phillip Wang, from Dr. Hess' laboratory was taking items from Tsien's laboratory.

237.   It was very odd that Phillip Wang showed up in Tsien's CL laboratory, as he had left BBDI two years ago and never answered calls from Tsien or other associates in Tsien's lab.

238.   Tsien also discovered that Ann Stephens sent emails to the department and other departments, stating: "Tsien is in the process of cleaning out CL 3072. If you would like to take a look at what is left, Tsien will be over there at 9:00-9:30 in the morning. (July 18, 2:46 pm).

239.   Tsien's name was the only one left out of the email.

240.   This looting continued for many days, as Tsien remained locked out of the lab and office.

241.   As a result of this public looting, Tsien lost many items and instruments Tsien owned and had brought from Princeton and Boston.

242.   This blatant taking of Tsien's property, under the watchful eye of state actors, was and remains traumatizing, with nightmares and flashbacks from knowledge of historical events peoples were enslave, Native Americans rounded up and moved to Oklahoma, Jews rounded up while their houses and personal items were looted and taken by the government, then were taken to camps and murdered.

243.   In summer, when Dr. Frederick Gregory, the Army grant program officer, came to the campus to investigate the loss of the facility and equipment upon which the DoD funded project was critically dependent, Dr. Gregory asked

how the DoD grant could be completed, and Mr. Melcher falsely claimed that Dr. Tsien should be able to continue his Army project.

244.    Defendants openly and notoriously took property and limited the freedom of movement of Plaintiff as if he were a war criminal or had no right to his property, and as if they were immune from laws prohibiting discrimination.

245.    Defendants took the plaintiff's property as if they were immune and were acting in concert with federal authorities who authorized Defendants to take whatever action they deemed necessary to terminate Plaintiff.

246.    With or without superior authority cover, because Defendant knew that that they could not fire him for cause if they followed lawful process they engaged in a pervasive and prolonged gradual taking of these positions title lab equipment dignity and freedom to travel in order to constructively terminate him.

247.    Plaintiff suffered emotional and mental anguish and will reasonably be expected to suffer the same in the future.

248.    Plaintiff suffered economic damages as a result of the actions of defendants and will with reasonable certainty continue to suffer from damage and injury to his professional reputation.

249.    Count I

250.    Constructive Termination based on race and/or nationality in violation of Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983

251.    Plaintiff incorporates each and every paragraph above as if stated herein.

252.    Plaintiff resigned in mid November 2019 because no reasonable person would have tolerated the terms and conditions imposed upon Plaintiff by defendant Hess and plaintiff's employer the Board of Regents, since March 2018.

253.    Count II

254.    Deprivation of property interests without due process of law under 42 U.S.C. §§ 1981 and 1983.

255.    Plaintiff incorporates all paragraph above reflection taking of lab equipment, and destroying his reputation tin tnff Defendants Ats

256.    Count III

257.    Deprivation of the right to travel under 42 U.S.C. §§ 1981 and 1983.

258.    Plaintiff incorporates all paragraphs in which plaintiff was kept under house arrest or defendants interfered with his travel.

259.    Count IV

260.    unequal treatment in the workplace based on race and/or nationality in violation of Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983

261.   defendants objected plaintiff to treatment and deprivation of rights related to his employment under color of law on account of his race and/or nationality.

262.   Count V

263.   retaliation based on protected activity related to race and/or nationality in violation of Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983

264.   plaintiff objected to the harsh treatment based on his race and/or nationality and in retaliation defendants continued to deprive him of equal treatment under the law with regard to his employment eventually driving him out of his job.

W H E R E F O R E, Plaintiff prays judgment against Defendants for the following:

a).    Plaintiff seeks compensatory damages for all injuries proximately resulting from the Defendant's actions, in an amount to be determined by the enlightened conscience of the jury, for injuries including but not limited to, past mental and emotional suffering and anguish that will with reasonable certainty continue into the future,;

b).     Plaintiff seeks punitive damages against each Defendant due to the willful, wanton and deliberately indifferent nature of each Defendant's conduct in an amount to be determined by the enlightened conscience of the jury;

c).     Plaintiff seeks declaratory and injunctive relief that is consistent with the remedial purposes of the statutes;

d)     Afford Plaintiff a trial by jury on all issues so triable;

f).     Award Plaintiff pre-judgment and post-judgment interest;

g).     Grant Plaintiff the maximum front pay allowed under law, and all other just and equitable relief to prevent ongoing and future deprivations of the law;

h).     Deem Plaintiff a prevailing party and award her costs, attorneys' fees and expenses of litigation, including expert witness fees.

A JURY TRIAL IS HEREBY REQUESTED.

Respectfully submitted this 22nd day of May, 2020.

/s/ John P. Batson
John P. Batson
Ga. Bar No. 042150
Attorney for Plaintiff

Prepared by:
John P. Batson
P.O. Box 3248
Augusta, GA 30914-3248
Phone 706-737-4040
1.  FAX 706-736-339